# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 12-70 |
| | ) | Judge Nora Barry Fischer |
| JAN MICHAEL EDMONDS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on a Motion to Suppress Evidence, (Docket No. 32), filed by Defendant Jan Michael Edmonds on May 22, 2013 and the Government's opposition thereto, (Docket No. 33). On July 24, 2013, this Court held an evidentiary hearing on Edmonds' motion.[1] (Docket Nos. 37, 43). The official transcript of that proceeding has been reviewed and considered by the Court. (Docket No. 43). The parties submitted post-hearing briefs on an outstanding objection of the Government on an evidentiary issue and a related post-hearing motion to produce filed by the defense. (Docket Nos. 39-44). The Court issued its rulings on these matters on September 20, 2013. (Docket No. 45). The parties then submitted proposed findings of fact and conclusions of law on September 27, 2013, (Docket Nos. 48, 49), the Government filed a response to defendant's proposed findings of fact and conclusions of law on October 7, 2013, (Docket No. 50), and Defendant filed his reply to same on October 11, 2013, (Docket No. 51). Upon consideration of all of the parties' submissions and the evidence of record, and for the following reasons, Defendant's Motion to Suppress [32] is granted, in part, and denied, in part.

---

[1] The Court also heard oral argument as to Defendant's "Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609," (Docket No. 31), and the Government's opposition thereto, (Docket No. 33). The Court will issue a separate written order addressing such Motion.

I.      FINDINGS OF FACT

The present motion to suppress evidence challenges the constitutionality of a search of Edmonds and seizure of a firearm and ammunition from his person, and the incriminating statements he allegedly made to the responding officers, during events which occurred on January 15, 2012, in the Homewood section of the City of Pittsburgh.  (Docket No. 32).  The Government conceded that a warrantless search and seizure occurred on that date and presented evidence supporting the reasonableness of the search and seizure at the suppression hearing, including the testimony of Officer Andrew Miller, one of the City of Pittsburgh Bureau of Police officers who were involved in the arrest of Edmonds on that date.  (Docket No. 43).  The Court recognizes that Edmonds has attempted to undermine the credibility of the Government's evidence by introducing numerous exhibits for the purpose of impeaching the testimony of Officer Miller, the alleged hearsay statements by his former partner Officer Michael Flynn, and even challenging the credibility of Officer Jonathan Gromek, who arrived at the scene later and recovered an extended magazine from Edmonds' pocket while conducting a pat-down search incident to his arrest.  (*See* Def. Exs. A, H, I, J, K).  In this Court's estimation, based on Officer Miller's demeanor and his testimony in response to the questioning of the attorneys and the Court at the suppression hearing, he offered credible testimony to the Court concerning his version of the events that unfolded on the date in question, despite Edmonds' considerable efforts to impeach him.  *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").

Additionally, the Court also found Officer Miller's testimony to be generally consistent with the information provided by the officers in the police reports prepared on January 16, and 17, 2012 (Def. Exs. F, E), and the prior testimony of Officer Flynn at a preliminary hearing on January 25, 2012, (Def. Ex. G), versions of the events which were procured closer in time to Officer Miller's testimony during the suppression hearing held on July 24, 2013 in this case.[2] In fact, Officer Miller's testimony before this Court was made without him having reviewed Officer Flynn's testimony at the preliminary hearing, which lends further credence to his version of the events that transpired. (Docket No. 43 at 37).

With that ruling, the Court turns to its specific findings of fact, made based on the credible evidence presented at the hearing.

On the evening of January 15, 2012, Officers Miller and Flynn were on patrol in full police uniforms and a marked police vehicle in the Homewood section of Pittsburgh, Pennsylvania. (Docket No. 43 at 12). As of this date, Officer Miller had been with the City of Pittsburgh Bureau of Police for a little over two years (since September of 2009). (*Id.* at 58). However, prior to joining the City's police force, he was an eight-year Army Veteran, serving as

---

[2]     The Court notes that, in contrast, the impeachment evidence submitted by the defense largely concerned events that occurred subsequent to the events of January 15, 2012, which resulted in the prosecution of Edmonds in this case. To this end, the following evidence all refers to events that occurred after January 15, 2012: the criminal complaint and affidavit of probable cause alleging that Officer Flynn engaged in illegal activities on March 17, 2013 (Def. Ex. A; I); a civil amended complaint filed against Officer Miller at Civ. A. No. 13-677 alleging that he engaged in excessive force in an incident on May 26, 2012 (Def Ex. H); a civil complaint filed against Officer Miller at Civ. A. No. 13-1364, alleging that he engaged in excessive force on November 11, 2012 (Def. Ex. J); and news articles referencing a June 26, 2013 incident wherein Officer Gromek arrested a teacher outside a community meeting in Homewood, (Def. Ex. L). The Court notes that the Government has objected to the Court's consideration of this evidence because the Court held in the September 20, 2013 Order that the record for the suppression hearing has closed. (Docket Nos. 45, 50). However, because the Court has reviewed the evidence and believes that it is irrelevant, the Government's objections are now moot. The Court further expressly reserves any ruling on the admissibility of such post-incident impeachment evidence until the time and place of trial.

    The Court additionally comments that Edmonds presented several color photographs of the streets and intersections in Homewood where the activities took place. (Def. Exs. B-D). Although it is not disputed that the photographs were taken of the general area of the events in question, and that the Government did not object to their admission into evidence, the Court recognizes that the photographs were taken in daylight (while the activities took place at a time when the area was dark, 9:00 p.m.) and more than a year after Edmonds' arrest. (Docket No. 43). As such, the photographs do not accurately depict the area as Officers Miller and Flynn observed it from their squad car and as they chased the defendant on foot through the streets of Homewood during the events in question.

a paratrooper in the 82nd Airborne Division and had attended numerous training seminars on concealed weapons, vehicle searches and seizures and was a member of the SWAT team.[3] (*Id.*). Officer Miller has been assigned to Zone 5 of the City of Pittsburgh for his entire career. (*Id.*). Zone 5 consists of several east-end City neighborhoods including, Homewood, Garfield, East Hills, Larrimer, Lincoln-Lemington, Morningside, Highland Park and Bloomfield. (*Id.* at 10-11; Govt. Ex. 1). Officer Miller described the Homewood area generally as plagued by violent crime. (Docket No. 43 at 12-13). He offered some clarification in support of these statements, noting that he had personally responded to robberies, shootings and assaults in Homewood in the past and he estimated that these incidents had occurred a few blocks from the area where the incident involving Defendant occurred on Monticello Street. (*Id.* at 61-63). However, Officer Miller was unable to recall any specific criminal incidents which occurred in the exact location of the instant traffic stop, i.e., the intersection of Monticello and Brushton Streets.[4] (*Id.* at 66).

On the evening of January 15, 2012, Officer Flynn was driving the police cruiser while Officer Miller was the passenger in the car. (Docket No. 43 at 13). Officer Miller testified that they were patrolling the Homewood area, "checking for warrant suspects" "in hot spots in the zone … where they had made arrests before." (*Id.* at ). As such, they were not investigating any specific criminal incident like a shooting or an assault. (*Id.* at 63). At around 9:00 p.m., the officers were driving near Monticello Street and North Homewood Street in Homewood. (*Id.* at 13, 32). Officer Miller recalled that it was dark and cold but the weather was clear. (*Id.* at 13,

---

[3]     Officer Miller also testified that he had some college education, studying at both Pitt and Penn State, but did not obtain a four-year degree. (Docket No. 43 at 58).

[4]     A review of the map of Homewood demonstrates that some of the incidents he cited during his testimony occurred farther from the scene than he estimated. (Govt. Ex. 2; Def. Ex. K). However, the Court finds that such discrepancies were minor (i.e., he estimated that Apple Street and Chaucier St. were four blocks away when the evidence shows that such intersection is .2 miles away), and Officer Miller was not given the opportunity at the hearing to review the map that was admitted into evidence in relation to this portion of his testimony. As such, these minor discrepancies do not undermine the credibility of his testimony, as Edmonds argues.

31).  He confirmed that it was not snowing and there was no snow piled up on the ground.  (*Id.* at 60).

From their squad car, the officers observed a dark colored Jeep travelling "down" Monticello Street toward Brushton Avenue at a high rate of speed.  (*Id.* at 13).   Monticello Street is a two-lane road with opposing lanes of traffic, although the road is unmarked and the lanes are not separated by yellow lines.  (*Id.* at 16).  Officer Miller explained that the vehicle caught their attention "because other vehicles in the area were not traveling at that speed" and they believed that the Jeep was "clearly exceeding the residential neighborhood speed limit of 25 miles per hour."  (*Id.* at 15-16).  The officers did not have a speed timing device at the time and thus were not able to obtain an exact speed of the vehicle.  (*Id.* at 50).  Officer Miller recounted that there were no noticeable pedestrians present on Monticello Street at the time.  (*Id.* at 39-40).  They pursued the vehicle on Monticello Street for several blocks, crossing through the intersections of Sterrett Street and Collier Street.  (*Id.* at 15; Govt. Ex. 2; Def. Ex. K).  Officer Miller confirmed that there are stop signs at both intersections but could not recall if the Jeep properly stopped at either of the stop signs.  (*Id.* at 32-33).  Officer Flynn likewise testified at the preliminary hearing that he could not recall if the Jeep properly stopped at the stop signs.  (Def. Ex. G).  Consistently, the officers did not report that the Jeep ran the two stop signs in their reports and criminal complaint.  (Docket No. 43 at 35-36; Def. Exs. E, F).

While Officer Flynn drove the vehicle, Officer Miller was attempting to identify the license plate of the car, so that he could run the license plate in order to determine if the car was stolen or if the registered owner had any outstanding warrants.  (*Id.* at 15-16).  Officer Miller ran the plate through the Mobile Data Terminal system, which reported that the registration was in temporary status, and he advised Officer Flynn of this fact.  (*Id.* at 43-45).  Officer Miller then

observed the Jeep "jerk" to the left, cross over the opposing lane of traffic and pull toward the curb on the opposite (left) side of the road to park. (*Id.*). At that point, Officer Flynn immediately "clicked" the switch to activate the squad car's lights and sirens in order to initiate a traffic stop of the Jeep for committing the crime of careless driving. (*Id.* at 41-42, 49). Officer Flynn pulled the squad car behind the Jeep and the occupant of the Jeep (Edmonds) opened the door and started fleeing the scene. (*Id.* at 17, 50). Officer Miller testified that the events in question occurred within seconds of the driver jerking the Jeep to the left side of the road. (*Id.* at 42). He also credibly testified that the driver (Edmonds) was not fully out of the car prior to Officer Flynn turning on the lights. (*Id.* at 17, 50). Officer Flynn likewise testified that the events unfolded almost simultaneously at the preliminary hearing, stating that the vehicle "was stopped as [he] put [the squad car's] lights and sirens on." (Def. Ex. G at 25).

As Edmonds fled on foot, the officers yelled verbal commands for him to stop, which he ignored. (*Id.* at 17). After the squad car was parked, Officer Miller quickly exited the vehicle and pursued Edmonds on foot, continuing to shout verbal commands for him to stop. (*Id.* at 18, 54). These additional verbal commands were likewise ignored. (*Id.*). While chasing Edmonds, Officer Miller noticed that he was continually reaching for his waistband and appeared to be attempting to conceal something. (*Id.* at 18). Edmonds then reached the intersection of Monticello and Brushton and turned right onto Brushton, heading down a hill. (*Id.* at 18).

Officer Miller was able to catch up to Edmonds about fifty feet from the intersection, tackled him from behind and took him to the ground. (*Id.* at 18). The result of the continued force of the tackle put Officer Miller on top of Edmonds' back, who was now in a position face-down on the ground. (*Id.*). Edmonds continued to resist Officer Miller's efforts to arrest him and place him in handcuffs while in this position. (*Id.* at 18-19). Officer Miller persisted in

yelling additional commands to Edmonds, including to "show his hands," which were underneath his body near his waistband. (*Id.* at 18-19). Edmonds remained non-compliant and refused to pull his hands behind his back, which would have enabled him to be handcuffed more easily. (*Id.*). Officer Miller candidly testified that he punched Edmonds on the left side of his face in an effort to exert "pain compliance." (*Id.*).

During Officer Miller's chase of Edmonds, Officer Flynn was also giving chase but was some distance behind them. (*Id.* at 19). After Officer Miller tackled Edmonds and had executed the punch, Officer Flynn caught up to their location. (*Id.*). At that point, Edmonds was still noncompliant to the orders and Officer Flynn executed three baton strikes to the muscular portions of Edmonds' legs. (*Id.*). Edmonds then submitted to the officers' demands and removed his hands from under his body. (*Id.*). Edmonds was handcuffed by Officer Miller while Officer Flynn observed from a close position. (*Id.*).

As Officer Miller applied the handcuffs to Edmonds, Officer Flynn observed a "large unnatural bulge" in the rear of Edmonds' pants. (*Id.* at 21). Officer Flynn approached closer to them, felt the area around the rear of Edmonds' pants where he observed the bulge and recognized the bulge to be a firearm. (*Id.*). Officer Flynn immediately seized a .40 caliber Glock pistol, which contained nine (9) .40 caliber rounds, from Edmonds and he secured the weapon and ammunition. (*Id.* at 20, 56; Def. Ex. F).

The officers moved Edmonds from this position and sat him on a guardrail on Brushton Street. (Docket No. 43 at 20, 56). Edmonds remained hand-cuffed. (*Id.* at 56). Officer Miller testified that Edmonds was under arrest at this point. (*Id.* at 57). However, he was not read *Miranda* warnings by the officers at that time. (*Id.*). Instead, Officer Flynn asked Edmonds if he had a permit for the firearm and Edmonds responded, "no." (*Id.* at 56).

The officers conducted an investigation on scene concerning Edmonds and the firearm through the National Criminal Information Center ("NCIC"). (*Id.* at 22). The NCIC check disclosed that the firearm which was recovered had been previously reported as stolen. (*Id.*). They also ascertained Edmonds' other vital information such as his address and Social Security Number. (*Id.* at 22). They determined that Edmonds's driving privileges had been suspended by the Commonwealth of Pennsylvania, and that he had prior felony convictions, which prohibited him from possessing firearms and ammunition. (*Id.*).

Backup units arrived on scene shortly after Edmonds was detained and the investigation was ongoing. (*Id.* at 22-23). Officer Jonathan Gromek conducted a search incident to Edmonds' arrest. (*Id.* at 23, 57). During the search, Officer Gromek recovered an extended magazine from Edmonds' left, front pocket. (*Id.* at 23, 57). The extended magazine contained 21 rounds of .40 caliber ammunition. (Def. Ex. F).

On January 16, 2012, a criminal complaint was lodged against Edmonds, charging him with the following state crimes: carrying a firearm without a license, 18 Pa. C.S. § 6106(a)(1); receipt of stolen property, 18 Pa. C.S. § 3925(a); persons not to possess, use, manufacture, control, sell or transfer firearms, 18 Pa. C.S. § 6105(a); resisting arrest, 18 Pa. C.S. § 5104; escape, 18 Pa. C.S. § 5121(a); driving while operating privileges suspended, 75 Pa. C.S. § 1543(a); parking regulations on two-way highways, 75 Pa. C.S. §3354(a); and, careless driving, 75 Pa. C.S. § 3714(a). (Def. Ex. E). A preliminary hearing was held on the state charges before the Honorable Edward Tibbs, in City Court on January 26, 2012, at which time all of the charges were held over for court. (Def. Ex. G).

II.      PROCEDURAL HISTORY

As noted, the case was initiated in state court but was later adopted for federal prosecution. To this end, a federal grand jury returned a two count Indictment against Edmonds on March 21, 2012, charging him with one count of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count One) and one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j) (Count Two). (Docket No. 1). Defendant filed the instant motion to suppress on May 22, 2013, (Docket No. 31), to which the Government filed a response in opposition on June 5, 2013, (Docket No. 34). This Court held a hearing on Defendant's motion on July 24, 2013, (Docket Nos. 37, 43), and issued a ruling on certain evidentiary disputes on September 20, 2013, (Docket No. 45). In accord with the Court's Order, the parties submitted post-hearing proposed findings of fact and conclusions of law on September 27, 2013. (Docket Nos. 48, 49). The Government filed its response on October 7, 2013, (Docket No. 50), to which Defendant filed a reply on October 11, 2013, (Docket No. 51). As the matter has been fully briefed and argued, it is now ripe for disposition.

III.    LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citations omitted).

IV.    DISCUSSION

In his motion to suppress, Edmonds challenges the evidence seized in this case under the Fourth and Fifth Amendments to the United States Constitution. (Docket Nos. 32, 48, 51). The Government maintains that the evidence should not be suppressed as it was not obtained in violation of Edmonds constitutional rights. (Docket Nos. 33, 49, 50). The Court will discuss the

parties' positions as to the constitutionality of the officers' collection of the challenged evidence, in turn.

### A. Fourth Amendment

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. AMEND. IV; *see also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches are *per se* unreasonable subject only to a few specifically established and well delineated exceptions. *Horton v. California*, 496 U.S. 128, 133 (1990). Because no warrant authorized the search here, the burden is on the Government to prove by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). One exception to the warrant requirement is the *Terry* stop and frisk. 392 U.S. at 20-22. Any evidence obtained pursuant to a search that does not meet a recognized exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

Generally, *Terry v. Ohio*, 392 U.S. 1 (1968), permits a police officer to conduct "a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). "[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). It is well established that officers are permitted to pull over a car suspected of violating any applicable vehicular traffic laws. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citations omitted). No further suspicion of criminal activity by the driver of the vehicle or the passengers therein is necessary to justify the

*Terry* stop of the vehicle. *Johnson*, 555 U.S. at 327. Although reasonable suspicion is less demanding than probable cause, the Fourth Amendment requires that an officer making a stop have some level of objective justification for that stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In evaluating whether a particular stop was justified, courts must look at the totality of the circumstances surrounding the stop. *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (citation omitted). Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors.

In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Wardlow*, 528 U.S. at 124.

The parties' initial disputes concern whether the officers' possessed reasonable suspicion to believe that Edmonds had committed a traffic violation prior to initiating the traffic stop of the dark colored Jeep he was driving on January 15, 2012. (Docket Nos. 48, 49). The Government maintains that the officers properly pulled over Edmonds' vehicle because they had reasonable suspicion to believe that he had committed traffic violations, i.e., for violating 75 Pa. C.S. § 3714(a), which proscribes "careless driving" and/or for violating 75 Pa. C.S. §3354(a), "parking regulations on two-way highways." (Docket No. 49 at 5-6). Edmonds challenges the sufficiency of the Government's evidence to support the initial stop of the vehicle. (Docket Nos. 32, 48, 51). His arguments are largely factual in nature and rely on his credibility attack of the testimony of Officer Miller and the other evidence of record. (*Id.*).

In this Court's estimation, the traffic stop was sufficiently supported by reasonable suspicion based on the Government's presentation of the credible testimony of Officer Miller concerning the totality of these events at the motion hearing. *See Johnson*, 555 U.S. at 327. To this end, Officer Miller explained that he observed Edmonds' vehicle driving on Monticello Street at a high rate of speed above the 25 miler-per-hour speed limit and later saw the vehicle "jerk" across the two-lane road and park illegally, facing the wrong-way on the street. (Docket No. 43 at 15-17, 41-45, 49). Such direct observations of traffic violations by police officers are plainly sufficient to support reasonable suspicion to warrant initiating a traffic stop as the officers did here. *See Bonner*, 363 F.3d at 217 (citing *Mimms*, 434 U.S. at 109) ("A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation."). A trained officer like Officer Miller, who had two plus years of experience with the City Police, would certainly possess reasonable suspicion that a vehicle speeding through a dark, residential neighborhood at 9:00 p.m. and then suddenly jerked across the lane of opposing traffic was

likely driving carelessly in violation of 75 Pa. C.S. § 3714(a). (Docket No. 43 at 15-17, 41-45, 49, 58). Further, the objective evidence of the officers' direct observation of a car parking illegally facing the wrong way on a two-lane road obviously supports reasonable suspicion that 75 Pa. C.S. §3354(a) was in the process of being violated. (*Id.* at 43-45). Accordingly, the Court finds that the initial traffic stop of the vehicle was lawful under the Fourth Amendment. *See Bonner*, 363 F.3d at 217.

In reaching this decision, the Court also expressly rejects Edmonds' challenges to the credibility of Officer Miller's testimony on these points and will only briefly address certain of his arguments which warrant some further elucidation. Edmonds suggests that his vehicle could not have been observed speeding along Monticello Street because there are stop signs at two intervening intersections (at Sterrett Street and Collier Street) and the officers neither reported that Edmonds failed to stop at the signs nor charged him with committing traffic violations for failing to stop at the stop signs. (Docket Nos. 48, 51). He thus asks that the Court not credit Officer Miller's testimony that the car was speeding. (*Id.*). But, Edmonds has not submitted any evidence in support of this theory (such as an eye-witness who claims that the Jeep was not speeding), and the Court does not believe such speculation undermines the Government's credible evidence to the contrary. Further, it is common sense that a vehicle is capable of speeding above a posted 25 mile-per-hour limit between the City blocks at issue here, the length of which are documented on both photographic evidence and maps. (Def. Exs. B-D, K; Govt. Ex. 2).

Edmonds also argues that a traffic stop was not actually executed by the officers because they did not turn on the squad car's lights and sirens until he had already parked and exited his vehicle. (Docket No. 48 at 21-22). Initially, the Court rejects such proposed finding

as contrary to the evidence.  As is noted above, the Court has found that Officer Flynn turned on the lights and sirens prior to Edmonds exiting the vehicle, which occurred seconds after he parked the car.  (Docket No. 43 at 17, 41-42, 49-50).  Further, Edmonds has cited to no decision which stands for the proposition that an individual who flees from his car on foot seconds before the officers turned on their lights and sirens successfully invalidates an otherwise lawful traffic stop by the officers.  (*See* Docket Nos. 48 at 21-22; 51).  Finally, even if Edmonds is correct on these factual and legal points, his actions of fleeing the scene upon seeing the police officers are among the totality of the circumstances which must be considered to determine if a valid *Terry* stop was conducted by the officers, issues which are addressed in more detail below.

Edmonds continues that the officers lacked the authority to arrest him for committing traffic violations and thus should have placed a ticket on his windshield rather than chase him through the streets of Homewood.  (Docket Nos. 48, 51).  This argument is unavailing for several reasons.  Upon making a lawful traffic stop of a vehicle, police officers are granted the authority "to detain the automobile and its occupants pending an inquiry into a vehicular violation." *Johnson*, 555 U.S. at 327.  The officers then "may exercise reasonable superintendence over the car and its passengers," and have the discretion to either: (1) order the driver and passengers to get out of the vehicle; or (2) remain in the vehicle while the officers investigate the violation. *Bonner*, 363 F.3d at 216 (citations omitted).  The officers may also execute a *Terry* patdown search for weapons of any occupants of the vehicle upon reasonable suspicion that the occupant is armed and dangerous.  *Johnson*, 555 U.S. at 326.  The Third Circuit has recognized that an individual who flees from the scene of a lawful traffic stop prevents the officers from conducting such an investigation and subjects the individual to further investigation of the reasons for his or her flight, even if the initial traffic stop was made for nominal traffic violations such as a burnt

out headlight and an expired inspection sticker. *Bonner*, 363 F.3d at 215. The same is true here as Edmonds' flight escalated the situation from a stop for routine traffic violations (careless driving and the parking violation) to an investigation by the officers as to why he was rapidly fleeing the scene and failing to accede to their commands. Again, these issues are more fully addressed in the context of the *Terry* stop below.

For these reasons, the Court concludes that the traffic stop was lawfully initiated by the officers because the totality of the circumstances support a finding that they had reasonable suspicion to believe that the driver of the Jeep (Edmonds) had committed traffic violations prior to initiating the traffic stop. *See Johnson*, 555 U.S. at 327; *see also Bonner*, 363 F.3d at 216.

The next issue in dispute between the parties is whether the officers' possessed reasonable suspicion to conduct the *Terry* stop of Edmonds after he fled from the Jeep on foot when the officers initiated the squad car's lights and sirens. (Docket Nos. 32-33, 48-51). The Court again concludes that the totality of the circumstances demonstrate that the officers' actions were reasonable.

Edmonds is correct that mere flight from a law enforcement officer generally does not give rise to "reasonable, articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 124-25. However, flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion. *Id*. at 125–26. The United States Court of Appeals for the Third Circuit has affirmatively held that "[f]light from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion." *Bonner*, 363 F.3d at 218; *see e.g., United States v. Bledsoe*, 449 F. App'x 159, 164 (3d Cir. 2011) (holding officers had reasonable suspicion to pursue and seize fleeing defendant from traffic stop due to vehicle rolling through a stop sign and

having an expired registration); *United States v. Mercer*, 316 F. App'x 183, 187 (3d Cir. 2009) (holding officers had reasonable suspicion to pursue and seize fleeing defendant from traffic stop due to speeding violation). Further, a defendant's flight from a lawful traffic stop, without first giving officers the opportunity to announce the purpose of the stop, and continued flight after repeated failures to accede to the officers' commands to stop, may give rise to reasonable suspicion. *Bonner*, 363 F.3d at 218. In addition, police officers are allowed to use a reasonable amount of force necessary to effectuate a traffic stop. *Bonner* 363 F.3d at 217 (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Finally, reasonable steps may be taken, such as searching for a firearm, during a *Terry* stop to ensure that the scene is safe and secure before further investigation. *United States v. Johnson*, 592 F.3d 442 (3d Cir. 2010).

Having fully considered the parties' positions and the credible evidence of record, the Court finds that the officers had reasonable suspicion that Edmonds was involved in likely criminal activity as they chased him on Brushton Avenue. The totality of the circumstances faced by the officers included: (1) that they were patrolling the Homewood section of Pittsburgh in the general vicinity of where violent crimes had occurred in the past, (Docket No. 43 at 12-13, 61-63, 66; Govt. Exs. 1-2; Def. Ex. K); (2) they observed a vehicle driving carelessly and above the posted speed limit through a residential neighborhood on a dark, January night, (Docket No. 43 at 13, 15-16); (3) the vehicle hastily pulled over to the wrong side of the road as police approached, (*Id.* at 17, 43-45); (4) as the officers initiated the squad car's sirens and lights, Edmonds exited the vehicle and immediately started running away from the officers, (*Id.* at 17-18, 54); (5) Edmonds ignored repeated commands by the officers to stop as they gave chase, (*Id.*); (6) Edmonds was grabbing at his waistband while he ran, trying to conceal something from the officers, (*Id.* at 18); and, (7) as Edmonds would not listen to the commands, Officer Miller

tackled him to the ground in order to stop him from continuing to flee from the officers, (*Id.*). In this Court's opinion, the instant facts are remarkably similar to the facts of *Bonner*, wherein the Court of Appeals held that the actions of the officers were supported by reasonable suspicion to conduct a *Terry* stop. To this end, the Court of Appeals succinctly described the facts of that case as:

> Bonner did not simply flee upon "noticing" police, nor did he simply refuse to cooperate during a consensual encounter. Bonner fled from a lawful traffic stop, before the officers had the chance to announce the purpose of the stop. He continued fleeing despite repeated orders to stop, and he did not stop running until he was tackled by Officer English. Bonner's flight from a lawful police traffic stop, where that flight prevented the police from discharging their duty of maintaining oversight and control over the traffic stop, provided the officers with reasonable suspicion to stop Bonner for further investigation. Flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion.

*Bonner*, 363 F.3d at 218. The Court reaches the same conclusion as the *Bonner* court based on the totality of the circumstances at issue in this case and holds that the officers had reasonable suspicion to conduct the *Terry* stop.

Edmonds challenges each piece of the evidence individually in an unconvincing attempt to reason each away from the Court's consideration. (Docket Nos. 48, 51). However, the Court's standard of review requires it to view the totality of the circumstances and to determine whether the officers' conduct was reasonable. *See Sokolow*, 490 U.S. at 8. Here, while the officers were initially presented with a straightforward traffic stop, the situation quickly evolved into a more serious encounter due to Edmonds own failure to respond to the officers' commands. As the Court has generally discussed above, Edmonds believes that he should have been permitted to run away from the traffic stop under *Wardlow*, *Navedo* and other precedent. But,

those cases did not involve lawful traffic stops of vehicles at all. *See Wardlow*, 528 U.S. at 126 ("flight is not necessarily indicative of criminal activity"); *see also United States v. Navedo*, 694 F.3d 463, 471 (3d Cir. 2012). Instead, the facts of those cases were such that the individuals were standing on the street and fled upon the sight of officers. *See id.* Courts have routinely followed *Wardlow* and held that evidence of "mere flight" from such encounters with law enforcement is insufficient to demonstrate reasonable suspicion. *See Navedo*, 694 F.3d at 469-71. In contrast, the law is clear that flight from a lawful traffic stop, along with other credible evidence, may be sufficient to justify reasonable suspicion of criminal activity. *Bonner*, 363 F.3d at 218. To conclude, the Court believes that all of the credible facts that the Government has presented takes this case beyond the "mere flight" precedent upon which Edmonds relies.

Edmonds also argues that the Government's evidence is insufficient to demonstrate that the area of Homewood at issue here (near the intersections of Monticello Street and Brushton Avenue) is a "high crime area." (Docket No. 48, 51). The Government responds that it is not relying on the "high crime area" theory to justify the *Terry* stop in this case as the officers' conduct was reasonable under the totality of the circumstances, even without the Court making such finding. (Docket No. 50). The Court generally agrees with the defense that the Government's evidence may be insufficient for the Court to make an express holding that Homewood is a "high crime area" as that phrase has been used by the Supreme Court in *Wardlow* and later refined in subsequent precedent. *See Wardlow*, 528 U.S. at 124-25. However, such a finding is unnecessary because the Government has adduced evidence in addition to Edmonds' flight which supports the reasonable suspicion of a *Terry* stop in this case, as is detailed above. Further, the Court is tasked with considering the totality of the circumstances of the entire situation and the officers' awareness of prior violent crimes having

occurred in the general vicinity is certainly one of the factors which must be considered in the evaluation of all of the evidence, regardless of whether the Government's evidence is sufficient to demonstrate that Homewood constitutes a "high crime area" under *Wardlow*.

The Court next holds that the use of force by the officers against Edmonds was reasonable under the totality of circumstances. *Bonner* 363 F.3d at 217 (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Officers are permitted to use force against an individual which is reasonably necessary to effectuate a traffic stop. *Id.* Once again, the Court looks to all of the credible facts in the record to determine whether the officers acted reasonably in using force to effectuate the seizure. *See Graham*, 490 U.S. at 396 ("[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.") (internal quotation omitted). Here, prior to using any force against Edmonds, the officers possessed all of the facts which the Court has extensively recounted above and also were faced with evidence that Edmonds was likely armed and dangerous and posed a physical threat to them even if he was not. To this end, the credible evidence established that the officers were: (1) chasing Edmonds who would not listen to officers' commands to stop without being tackled, (Docket No. 43 at 18); (2) attempting to control a man (Edmonds) who was much larger than the officers at approximately 5'11'' and 220 pounds versus Officer Miller (6'0'' and 185 pounds) and Officer Flynn (5'9'' and 180 pounds) (Def. Ex. E; Docket No. 43 at 60-61); (3) Edmonds was resisting all efforts to be handcuffed by laying on top of his hands, (*Id.* at 18-19); and, (4) Edmonds was refusing to show his hands to the officers and was previously observed

attempting to conceal something in his waistband, (*Id.*). At this point, Officer Miller candidly admitted that he punched Edmonds in the face with a closed fist for "pain compliance," but Edmonds continued to resist his efforts to handcuff him. (*Id.*). Officer Flynn observed this struggle and struck Edmonds three times with his baton on the muscular part of his legs. Edmonds finally complied after this force was used to compel him to submit to the officers' commands. (*Id.*). The Court found Officer Miller's testimony to be credible on these points; indeed, such events were fully described in the police reports and criminal complaint produced on the date of the events in question. (*See* Def. Exs. F, E).

Edmonds characterizes the officers' use of force as an "unprovoked assault," "attack," "beat down" and other derogatory terms. (Docket Nos. 48, 51). However, the credible evidence before the Court demonstrates that the force which was used by the officers was reasonably necessary in light of all of the circumstances and the Court understands that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Here, the credible evidence shows that the force which was applied to Edmonds was reasonably necessary for the officers to control him as he was actively fleeing, unresponsive to their commands and noncompliant even after being punched in the face by one of the officers. *Id.* Additionally, Edmonds has not presented any evidence to rebut Officer Miller's credible account of what took place here. (*See* Docket No. 43). For example, he has not presented testimony of any witnesses who observed the encounter to undermine the officers' version of events nor any medical records, photographs or other evidence which would tend to show that the injuries sustained by Edmonds, if any, went beyond that necessary to stop Edmonds and to have him

comply with the officers' commands.  Therefore, based on the present record, the Court concludes that the force used to seize Edmonds was reasonable under the totality of the circumstances.

The Court further finds that the *Terry* search of Edmonds and seizure of the .40 caliber Glock pistol by Officer Flynn from the rear of his pants was reasonable given all of the credible facts in the record.  *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (To assess the legality of a protective frisk, a court also looks at the "totality of the circumstances - the whole picture" to see whether the officer had a particularized, objective basis for his or her suspicion.).   In addition, upon recovery of the firearm, the officers plainly had probable cause to arrest Edmonds, a felon, for unlawful possession of the weapon.  *See* 18 Pa. C.S. § 6106(a)(1).  As such, the search incident to his arrest conducted by Officer Gromek, which located the extended magazine in Edmonds' front pocket, was fully justified.  *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest.").

For these reasons, Edmonds' motion to suppress is denied to the extent that he argues that his Fourth Amendment rights were violated.

B.    *Fifth Amendment*

The Fifth Amendment self-incrimination clause provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. AMD. V.  The Supreme Court has determined that a suspect must be given specific warnings of his Fifth Amendment rights prior to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* specified these rights as follows: "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of

an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. The Court further explained "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Additionally, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Here, Edmonds contends that his statement to police that he did not have a permit for the firearm was made in violation of his Fifth Amendment rights because he was subject to a custodial interrogation and not given his *Miranda* rights. (Docket Nos. 32, 48, 51). The Government avers that the officer's question concerning the permit does not constitute an interrogation but instead is akin to eliciting background information from the Defendant. (Docket Nos. 33, 49, 50). The Government further suggests that the evidence was properly obtained under the public safety exception and/or under the doctrine of inevitable discovery. (*Id.*).

In this Court's estimation, Edmonds' statement denying that he had a permit to carry a firearm must be suppressed because the totality of the circumstances demonstrate that he was subject to a custodial interrogation without being read his *Miranda* rights. To this end, the credible facts established at the hearing were that the questioning did not occur until <u>after</u> Edmonds had been placed under arrest by the officers and he was sitting on the guardrail on Brushton Avenue. (Docket No. 43 at 20, 56-57). According to Officer Miller, Officer Flynn asked Edmonds if he had a permit for the firearm and he responded "no." (*Id.* at 56). There can

be no dispute that Edmonds was "in custody" for *Miranda* purposes at this time because Officer Miller testified that he was "absolutely" under arrest at this point. *Miranda*, 384 U.S. at 479. The issue for the Court then becomes whether Edmonds was subject to a custodial interrogation via the questioning by Officer Flynn.

To this end, the Court is unmoved by the Government's arguments that Edmonds was not subject to a custodial interrogation when he was asked by Officer Flynn about whether he had a permit to carry the firearm. As Edmonds points out, carrying a firearm without a permit is a violation of Pennsylvania law and the questioning by Officer Flynn about whether he had a permit to carry the firearm clearly sought a potentially incriminating response. (Docket Nos. 48, 50). Indeed, Edmonds was charged by the officers with carrying a firearm without a license, 18 Pa. C.S. § 6106(a)(1). The fact that Pennsylvania law requires a person, who *is* licensed to carry a concealed weapon, to show the permit to officers upon a stop, does not mean that an individual who *is not* so licensed can be compelled by the officers to respond to these types of inquiries, without them having first affirmatively waived their *Miranda* rights. The Court is therefore not persuaded by the Government's positions that the question posed by Officer Flynn sought non-incriminating information or that Edmonds' response is admissible under the public safety exception.[5] To this end, the question posed was not a "routine booking question" seeking "biographical data necessary to complete booking or pretrial services," *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990), nor was the question about whether he had a permit a question "necessary to protect either the public or police from eminent danger," *New York v. Quarles*, 467

---

[5]     The Court notes that the defendant in *United States v. Stanton*, 2013 WL 228241, at *4-5 (W.D. Pa. Jan. 22, 2013), did not challenge the constitutionality of the permit question. As such, this Court's comment that the permit question posed to Stanton was "pertinent to officer safety" was unnecessary to the Court's decision and is properly characterized as dicta. *Id.* In this case, the Court is persuaded by Edmonds that based on the totality of the circumstances in his situation, the question posed by Officer Flynn constituted a custodial interrogation and Edmonds' response must be suppressed as he was not given *Miranda* warnings.

U.S. 649 (1984), because whether Edmonds had a permit or not has little to do with the safety of the officers in the totality of the present factual scenario where Edmonds had been arrested after he was forcefully detained.

The Court finds that this case is similar to *United States v. Jackson*, 2009 WL 3008993 (W.D. Pa. Sept. 21, 2009), wherein a defendant's statements about his possession of a firearms' permit were suppressed in a factually analogous situation. In *Jackson*, the questioning occurred after the defendant had already been pulled over and handcuffed after a traffic stop for a stolen license plate. *Id.* The officer saw the firearm in plain view in the vehicle and asked the defendant if he had a permit for the firearm. *Id.* Judge Cohill held that the statements concerning the lack of a firearms permit were suppressed because the existence of the firearm was not one of the initial bases for the *Terry* stop, but rather the stop was initiated solely to investigate the stolen license plate. *Id.* The Court agrees with the reasoning of *Jackson* and believes that the totality of the circumstances in this case were such that Edmonds was subject to a custodial interrogation by Officer Flynn and that the question sought an incriminating response from him about a fact that was not critical to the investigation of traffic violations, the purpose of the initial stop. Accordingly, the statement must be suppressed as it was obtained in violation of Edmonds' Fifth Amendment rights.

The Government alternatively maintains that the statement is admissible under the doctrine of inevitable discovery. (Docket Nos. 49, 50). Edmonds opposes this position and contends that the Government has not proven that it could have lawfully obtained such a statement from him under lawful means. (Docket Nos. 48, 51). The inevitable discovery doctrine permits the admission of illegally obtained evidence where it can be shown that such evidence would have been discovered by the authorities through a proper channel. *See Nix v.*

*Williams*, 467 U.S. 431, 444 (1984). Evidence obtained unlawfully is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," i.e., that it would have been discovered in the absence of a constitutional violation. *Id.* The Government can meet its burden by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence." *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). This limitation on the scope of the exclusionary rule insures that the police and the prosecution are not put in a worse position than if there had been no constitutional violation. *See Nix*, 467 U.S. at 443-44.

On this point, the Court holds that the Government has failed to prove by a preponderance of the evidence that the challenged evidence—Edmonds' statement that he did not have a firearms' permit—would have been lawfully discovered by the police following routine procedures. While the Court agrees with the Government that it certainly proved by a preponderance of the evidence the facts that Edmonds did not have such a permit and was a felon who was prohibited from possessing firearms in any event, the Government has presented no record evidence that it could have acquired a statement from Edmonds that he did not possess a firearms' permit through lawful means. (*See* Docket No. 43). For example, the Government has not presented any evidence that Edmonds was *Mirandized*, knowingly and voluntarily waived his *Miranda* rights and then gave the officers wide-ranging statements that included that he did not have a permit to possess the firearm, which would be a lawful means to obtain such incriminating statements from Edmonds. As such, the Government has not established that the inevitable discovery doctrine should apply in these circumstances. *See Stabile*, 633 F.3d at 245.

For these reasons, Edmonds' motion to suppress his statement that he did not possess a firearms' permit is granted.

V.      CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress is granted, in part and denied, in part.  An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge



Date:    November 12, 2013

cc/ecf:    All counsel of record.